UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------X

MODEL PARTNERS LIMITED, individually and on behalf of all others similarly situated,

                              Plaintiff,

-against-

BIOPURE CORPORATION, THOMAS A. MOORE, CARL W. RAUSCH, and RONALD F. RICHARDS.

                              Defendants.

------------------------------------------------------------X

Case No.

**04-10155**

CLASS ACTION
COMPLAINT
FOR VIOLATIONS
OF FEDERAL
SECURITIES LAW

MAGISTRATE JUDGE Alexander

**JURY TRIAL DEMANDED**

RECEIPT # 53356
AMOUNT $ 150
SUMMONS ISSUED 4
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE 1-23-04

Plaintiff, by his attorneys, for his Class Action Complaint alleges:

## NATURE OF THE CASE

1. This is a Class Action brought on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired Biopure ("Biopure" or the "Company") securities (the "Class") during the period March 17, 2003 through December 24, 2003, inclusive (the "Class Period").

2. This action, based on violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), arises out of a series of false and misleading statements and omissions of material fact by defendants regarding Biopure's financial results. Specifically, during the Class Period, Defendants made false and misleading statements that concealed the true nature of the true status of their clinical trials on Hemopure; Biopure failed to inform the investing public that since March or April of 2003, the FDA had in fact halted further clinical trials of Hemopure due to safety concerns.

00001517.WPD ; 1

SCANNED
DATE 1-26-04
BY: FZN

3. On December 24, 2003, Biopure announced that they had received a "Wells Notice" from the Securities Exchange Commission ("SEC") indicating that the SEC would potentially bring a civil injunctive proceeding against Biopure for issuing such statements about the Hemopure trials. The next trading day, Biopure's stock price dropped almost 16% in one day to close at $2.43, a 70% drop from a Class Period high of $8.25.

## JURISDICTION AND VENUE

4. This action arises under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 promulgated pursuant to section 10(b) by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. The jurisdiction of this Court is based on section 27 of the Exchange Act, 15 U.S.C. § 78aa; and on sections 1331 and 1337(a) of the Judicial Code, 28 U.S.C. §§ 1331, 1337(a).

5. Venue is proper in this District under section 27 of the Exchange Act, 15 U.S.C. § 78aa, and section 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b). The corporate headquarters of Biopure are located in this District.

6. In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

7. Plaintiff Model Partners Limited, as set forth in the accompanying certification, incorporated by reference herein, purchased shares of Biopure stock at artificially inflated prices during the Class Period as set forth in the accompanying certification and has been damaged thereby.

8. Defendant Biopure develops, manufactures and markets oxygen therapeutics, a new class of pharmaceuticals that are administered intravenously into the circulatory system to increase oxygen transport to the body's tissues. Biopure is a Delaware Corporation whose principal executive offices are located at 11 Hurley Street, Cambridge Massachusetts.

9. Defendant Thomas A. Moore ("Moore"), at all times relevant to this action, served as Biopure's President and Chief Executive Officer.

10. Defendant Carl W. Rausch ("Rausch"), at all times relevant to this action, served as Biopure's Vice Chairman and Chief Technology Officer.

11. Defendant Ronald F. Richards ("Richards"), at all times relevant to this action, served as Biopure's Chief Financial Officer.

12. Defendants Moore, Rausch, and Richards are referred to herein collectively as the "Individual Defendants." The Individual Defendants, by reason of their management positions and membership and ownership of the Company's stock, were at all relevant times controlling persons of Biopure within the meaning of section 20(a) of the Exchange Act. The Individual Defendants had the power and influence to cause Biopure to engage in the unlawful acts and conduct alleged herein, and did exercise such power and influence.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

13. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons who purchased or otherwise acquired Biopure securities from March 17, 2003 through December 24, 2003, inclusive. Excluded from the Class are defendants; members of the immediate families of the Individual Defendants; any entity in which any defendant has or had a controlling interest; and the legal

representatives, heirs, successors, or assigns of any defendant.

14. As of September 15, 2003, over 44 million shares of common stock of Biopure were outstanding in an actively-traded and efficient market in which millions of shares were traded during the Class Period. Biopure common stock is traded on the Nasdaq under the symbol "BPUR." The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff, and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class. Record owners and members of the Class may be identified from records maintained by Biopure or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

15. Plaintiff's claims are typical of the claims of the members of the Class in that plaintiff and each Class member purchased securities of Biopure during the Class Period and sustained injury as a result.

16. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

17. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to seek redress individually for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

18. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class:

a. Whether the federal securities laws were violated by defendants' acts as alleged herein;

b. Whether defendants acted wilfully or recklessly in omitting to state and misrepresenting material facts; and

c. Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

## FACTS

19. Biopure purportedly develops, manufactures and markets oxygen therapeutics, for both humans and veterinary use, designed to serve as an alternative to red blood cell transfusions and for use in the treatment of other critical care conditions. The Company has developed and manufactures two products: Hemopure - hemoglobin glutamer - 250 (bovine), or HBOC-201 for human use, and Oxyglobin — hemoglobin glutamer - 200 (bovine), or HBOC-301- for veterinary use. On July 31, 2002, Biopure submitted a biologic license application ("BLA") to the U.S. Food and Drug Administration ("FDA") seeking regulatory approval to market Hemopure in the United States for patients undergoing orthopedic surgery. Previously the Company had obtained approval in South Africa to market Hemopure for the treatment of adult surgical patients who are acutely anemic. In September 2002, the Company received a grant from the U.S. Department of the Army for the purpose of conducting clinical trials of Hemopure for the treatment of certain trauma patients. According to the Company's fiscal 2002 10-K, "[t]he Company has identified trauma as its next

clinical development priority and is working with a committee of independent civilian and military trauma experts to broaden its trauma program."

20. Unknown to shareholders, in March 2003, the Company submitted a "trauma study protocol" to the FDA, in connection with the Company's plans to conduct a "[p]hase II clinical trial" of Hemopure for the treatment of trauma patients. Immediately thereafter, the FDA informed defendants that the proposed clinical trials could not go forward, citing "safety concerns" arising from adverse clinical data submitted as part of the Company's July 2002 BLA seeking FDA approval to market Hemopure to orthopedic surgery patients. Importantly, this also put defendants on notice that FDA approval of the BLA, which would allow the first commercial distribution of Hemopure in the United States, was in serious doubt and most certainly would be delayed beyond the time frames previously communicated by defendants to the investing public.

21. Over the next nine months, despite numerous opportunities in press releases, analyst conference calls and SEC filings, defendants failed to disclose any of these adverse facts to the investing public. Indeed, the Company's periodic comments regarding Hemopure during the Class Period, materially misled investors concerning the commercial viability of Hemopure and the expected commencement of marketing the product in the United States. Prior to the disclosure of these adverse facts, defendants conducted at least two offerings of Biopure common stock generating millions of dollars in proceeds and certain high-level Biopure insiders, including defendants Moore and Rausch, sold hundreds of thousands of Biopure common shares to the unsuspecting investing public at artificially inflated prices.

22. Then, on December 24, 2003, under the threat of civil litigation by the SEC, defendants stunned the market by announcing that, in fact, the FDA had halted further clinical trials

of Hemopure due to safety concerns. Defendants also disclosed that the commercial release of Hemopure in the United States would be delayed beyond mid-2004.

23. Market reaction to defendants' belated disclosures was swift and severe. On December 26, 2003, Biopure common shares lost over 16% of their value to close at $2.43 per share, representing a 70% drop from a Class Period high of $8.25 per share, reached on or about August 21, 2003.

24. The Class Period begins on March 17, 2003. On that date, Biopure filed its quarterly report on Form 10-Q for the period ending January 31, 2003. The Form 10-Q, signed by defendant Richards, reported that the Company had a net loss of $0.36 per share during the first quarter fiscal 2003 compared to a net loss of $0.38 for the same period last year. In addition the Form 10-Q included the following representations concerning the Company's Hemopure research and development efforts, stating in pertinent part as follows:

> Research and development expenses continue to include amounts for support of the BLA review process including responding to FDA inquiries, preparing for and participating in FDA inspections of facilities and documentation and preparing for a possible FDA Advisory Panel presentation. These BLA support costs were $2,232,000 for the first fiscal quarter of 2003 and are expected to continue at approximately the same level ***until the middle of this calendar year, when the Company is hopeful that it will receive action by the FDA on the BLA.***
>
> ***If the FDA were to grant marketing approval for Hemopure this calendar year, we anticipate that we would have material revenues from this project in fiscal 2004.*** We do not anticipate that we will attain profitability, however, until we are able to increase our manufacturing capacity. There are substantial risks and uncertainties relating to whether and when we will obtain FDA approval for Hemopure, the timing of the construction of additional capacity and other factors that may affect our ability to generate a profit from our research and development of Hemopure. [Emphasis added.]

25. On or about March 25, 2003, Biopure issued a press release announcing that it has raised $13.4 million in gross proceeds through the sale of 5,548,480 shares of its common stock at $2.42 per share. The press release stated in pertinent part as follows:

> Hemopure(R) [hemoglobin glutamer - 250 (bovine)] is approved in South Africa for the treatment of adult surgical patients who are acutely anemic and for the purpose of eliminating or reducing the need for allogenic red blood cell transfusion in these patients. Biopure's application to market Hemopure in the United States for a similar indication in adult patients undergoing elective orthopedic surgery is currently being reviewed by the U.S. Food and Drug Administration[...]
>
> The previously announced $4.9 million in FY02/03 Congressional appropriations administered through the U.S. Army and anticipated $4 million in U.S. Navy funding from a Cooperative Research and Development Agreement (CRADA) *for clinical trials of Hemopure in trauma* are project-specific funds independent from Biopure's reported cash on hand. Completion of the pivotal RESUS clinical trial of Hemopure in trauma is contingent upon further funding. $908,900 of the Army funding is from Grant DAMD17-02-1-0697, for which the U.S. Army Medical Research Acquisition Activity, 820 Chandler Street, Fort Detrick MD 21702-5014 is the awarding and administering acquisition office. [Emphasis added.]

26. On or about May 22, 2003, Biopure issued a press release announcing its financial results for the second fiscal quarter ended April 30, 2003. For the quarter, the company reported a net loss of $0.35 per common share, compared with a net loss of $0.49 per common share, for the corresponding period in 2002. Regarding the FDA's pending approval of Bipoure's Hemopure BLA, the press release stated in pertinent part:

> Biopure is hopeful that in mid 2003 the FDA will complete its review and act on Biopure's biologic license application (BLA) to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery. As part of this review, the agency has inspected the company's manufacturing and

data-handling facilities and has audited its contract research partners and several clinical sites in the United States and South Africa. Biopure has responded to all questions raised by the FDA to date.

27. On or about May 30, 2003, the Company issued a press release announcing that the FDA had notified Biopure that it will complete its review and act on the Company's BLA for Hemopure by August 29, 2003. Defendant Moore commented on the FDA's review process:

> We're very pleased with the FDA's progress in reviewing our application[.] We continue to work closely with the agency toward a final decision that will allow us to make Hemopure available as an alternative to red blood cell transfusion. We're also continuing our preparations to roll out the product to leading orthopedic surgery centers following approval.

28. On or about July 23, 2003, Biopure issued a press release announcing that it has raised $17.2 million in gross proceeds through the sale of 3,083,000 shares of its common stock.

29. On or about August 21, 2003, Biopure issued a press release announcing its financial results for the third fiscal quarter ended July 31, 2003. For the quarter, the Company reported a net loss of $0.28 per common share, compared with a net loss of $0.43 per common share, for the corresponding period in 2002. The press release included the following representations concerning the FDA's review of the Company's Hemopure BLA, stating in pertinent part as follows:

> On July 30th, the FDA sent Biopure a letter stating that the agency has completed its review of the company's BLA to market Hemopure in the United States for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The letter requests additional information and suspends the BLA review clock with 30 days remaining in the original review cycle. It does not request additional clinical trials.

30. On or about October 30, 2003, Biopure announced its plan to respond by June 30, 2004, to the FDA's questions regarding its BLA for Hemopure. The press release stated that the Company has adjusted its operating plan to reduce expenses and conserve cash while it completes its written response to the FDA. The press release stated in pertinent part as follows:

> During the past two months the company has had several substantive interactions with the FDA to clarify the Agency's questions. Many of Biopure's responses have been completed. However, some require the retrieval of source medical documents and/or historical blood transfusion data from clinical trial sites in various countries, which will take several months to complete.

Defendant Moore commented, in pertinent part, as follows:

> In the best interests of our shareholders, today we've taken the steps necessary to more efficiently run our business while we complete our comprehensive response to all of the FDA's questions[.] We view the Agency's questions as a 'roadmap' to approval and have set a conservative, achievable target date for our response. We remain enthusiastically committed to commercializing Hemopure in the United States as expeditiously as possible."

31. The statements referenced above in ¶¶ 28-31 were each materially false and misleading when made because they failed to disclose certain existing material facts, including, inter alia:

(a) that Biopure had been notified by the FDA, as early as March/April 2003 that the Company's clinical trials of Hemopure for trauma applications had been put on hold due to "safety concerns" arising from adverse clinical data reviewed by the FDA in connection with the Company's BLA for Hemopure orthopedic applications;

(b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure in the United States was in serious doubt, and in any event could not have occurred sooner than

late 2004; and

    (c) based on the foregoing, defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

## THE TRUTH IS REVEALED

32. On December 24, 2003, after the close of the market, Biopure issued a press release announcing that on December 22, 2003, it received a "Wells Notice" from the staff of the SEC indicating the staff's preliminary decision to recommend that the SEC bring a civil injunctive proceeding against the Company relating to the Company's disclosures concerning its communications with the FDA about a trauma study protocol the company submitted to the Agency in March 2003 and about the Company's BLA for Hemopure. The press release stated in pertinent part as follows:

> Biopure submitted the trauma protocol for a Phase II clinical trial of Hemopure for the treatment of hemorrhagic shock casualties in the hospital setting, where red blood cell transfusions are available. The FDA placed this trauma protocol under a new IND that is separate from the company's previous IND and its BLA to market Hemopure for the treatment of acutely anemic adult patients undergoing orthopedic surgery and for the elimination or reduction of red blood cell transfusions in these patients. The protocol sought to administer up to 15 units of Hemopure, a proposed dosage that was 50 percent higher than administered in previous clinical trials.
>
> After the in-hospital trauma protocol was submitted to the FDA and the new WD was assigned, the Agency placed a clinical hold on the proposed trauma trial due to safety concerns. The FDA referred to a review of adverse event data from the company's Phase III orthopedic surgery trial, which was submitted in the BLA. The data from that Phase III trial has been previously presented at medical meetings.
>
> In May 2003, Biopure responded to the FDA's clinical hold and also filed the response as a BLA amendment because it discussed

>data previously submitted with the BLA. That amendment resulted in the FDA extending its BLA review period up to 90 days, as previously announced on May 30, 2003. The Agency also requested three additional pre-clinical animal studies of Hemopure in conscious swine to address its concerns regarding high-volume administration. After the company's responses, the FDA has twice declined to lift the clinical hold, most recently in a letter dated July 30, 2003.

The press release also indicated that regulatory approval of the Hemopure BLA would be postponed at least until the second-half of calendar 2004:

>A Biopure-requested meeting has been scheduled with the FDA on January 6, 2004, to discuss the BLA. If there are significant developments at or following this meeting, the company intends to report them promptly. Biopure still expects to respond to the questions in the FDA's complete response letter by June 30, 2004.

33. Market reaction to defendants' belated disclosures was swift and severe. On December 26, 2003, the first day of trading following Biopure's announcements, the price of Biopure common shares fell over 16% in value to close at $2.43 per share on trading volume of over 3 million shares.

34. On January 8, 2004, Biopure announced that the FDA had further doubts about Hemopure:

>Biopure Corporation reported that, on January 6, 2004, the company and the U.S. Food and Drug Administration (FDA) met at Biopure's request to discuss its reply to the FDA complete response letter regarding the company's biologics license application (BLA) for Hemopure(R) [hemoglobin glutamer - 250 (bovine)] and to discuss the company's clinical development plan. The company has submitted the BLA for FDA approval to market the product in the United States for the treatment of acutely anemic orthopedic surgery patients and the elimination or reduction of allogeneic red blood cell transfusions in these patients. During the meeting the FDA expressed concerns about the current BLA based on safety and efficacy questions, beyond those cited in the complete response letter, arising from the Phase III orthopedic

00001517.WPD ; 1                                    12

surgery trial. The Agency agreed to a continuing dialogue on these and other aspects of the BLA through meetings in advance of the company's planned reply to the complete response letter. Biopure continues to believe Hemopure is both safe and effective for the indication described in the BLA.

35. That day, the stock dropped a further 5.3 % to close at $2.26. By January 12, 2004, the stock dropped further to close at $2.06.

36. The market for Biopure's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Biopure's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Biopure securities relying upon the integrity of the market price of Biopure's securities and market information relating to Biopure, and have been damaged thereby.

37. During the Class Period, defendants materially misled the investing public, thereby inflating the price of Biopure's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, inter alia:

(a) that Biopure had been notified by the FDA, as early as March/April 2003 that the Company's clinical trials of Hemopure for trauma applications had been put on hold due to "safety concerns" arising from adverse clinical data reviewed by the FDA in connection with the Company's BLA for Hemopure orthopedic applications;

(b) that FDA approval of Biopure's BLA for commercial marketing of Hemopure

in the United States was in serious doubt, and in any event could not have occurred sooner than late 2004; and

(c) based on the foregoing, defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

38. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Biopure's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Biopure and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

39. As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Biopure, their control over, and/or receipt and/or modification of Biopure's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Biopure, participated in the fraudulent scheme alleged herein.

## COUNT I
## PURSUANT TO SECTION 10(b)
## OF THE EXCHANGE ACT AND
## RULE 10b-5 PROMULGATED THEREUNDER
## (Against All Defendants)

40. Plaintiff incorporates by reference the allegations of paragraphs 1 through 39 as if fully set forth herein.

41. The reported financial results of Biopure were materially false and misleading, and defendants knew or were reckless in not knowing they were so, because defendants prepared and participated in the issuance of the deceptive and materially false and misleading statements to the investing public, as set forth above.

42. Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct in an effort to maintain artificially high market prices for Biopure securities in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

43. As a result of the dissemination of the aforesaid false and misleading reports and releases, the market price of the securities of Biopure throughout the Class Period was higher than it would have been had the true facts concerning the Company's financial condition been known by the market.

44. In ignorance of the artificially high market prices of Biopure's publicly traded

securities, and relying upon the integrity of the market in which that stock was traded – the Nasdaq – and the other members of the Class acquired Biopure securities during the Class Period at artificially inflated prices and were damaged thereby.

45. Had the market known of the true financial condition of Biopure, which was falsely represented by defendants, plaintiff and the other members of the Class would not have purchased or otherwise acquired their Biopure securities during the Class Period at artificially inflated prices at which they did. Hence, plaintiff and the other members of the Class were damaged by defendants' violations of Section 10(b) and Rule 10b-5.

## COUNT II
## PURSUANT TO SECTION 20(a)
## OF THE EXCHANGE ACT
## (Against the Individual Defendants)

46. Plaintiff incorporates by reference the allegations of paragraphs 1 through 39 as if fully set forth herein.

47. This claim is asserted against the Individual Defendants and is based on section 20(a) of the Exchange Act. Individual Defendants acted as controlling persons of Biopure within the meaning of section 20(a) of the Exchange Act. By reason of their positions as officers and directors of Biopure and ownership of Biopure stock, Individual Defendants had the power and authority to cause or to prevent the wrongful conduct of herein and did exercise such power and authority.

48. By reason of the foregoing, Individual Defendants are liable jointly and severally with and to the same extent as Biopure for Biopure's violations of section 10(b) of the Exchange Act and Rule 10b-5.

## **PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff, on behalf of himself and the Class, prays for judgment as follows:

i. Declaring this action to be a proper plaintiff class action maintainable pursuant to rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaring plaintiff to be a proper representative of the Class.

ii. Awarding plaintiff and all of the other members of the Class damages in an amount to be proven at trial, together with prejudgment interest thereon;

iii. Awarding plaintiff the costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

iv. Granting plaintiff and the other members of the Class such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: 1/23/04

**GILMAN AND PASTOR, LLP**

By: *David Pastor*
David Pastor (BBO #391000)
Peter A. Lagorio (BBO #567379)
Stonehill Corporate Center
999 Broadway, Suite 500
Saugus, MA 01906
Ph: (781) 231-7850
Fax: (781) 231-7840

John G. Emerson
Scott E. Poynter
**EMERSON POYNTER LLP**
P.O. Box 164810
Little Rock, AR 72216-4810
Ph: (501) 907-2555
Fax: (501) 907-2556

Jeffrey S. Marks
**MARKS & ARTAU, P.A.**
2499 Glades Road, Suite 308
Boca Raton, Florida 33431
Ph: (561) 416-9801
Fax: (561) 416-9805

Marvin L. Frank
Eric J. Belfi
Gregory B. Linkh
**RABIN, MURRAY & FRANK LLP**
275 Madison Avenue, 8th Floor
New York, NY 10016
Ph: (212) 682-1818
Fax: (212) 682-1892

**Attorneys for Plaintiff**



**Emerson Poynter LLP**
Attorneys at Law

Little Rock
Houston

### CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

__MODEL PARTNERS LIMITED__ ("Plaintiff"), declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1. Plaintiff has reviewed the Biopure fraud class action complaint and authorized its filing.

2. Plaintiff did not purchase any common stock/securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate any private action under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4. The following includes all of Plaintiff's transactions during the Class Period specified in the complaint for the common stock/securities that are the subject of this action:

| SECURITY (Common Stock, Call, Put, Bonds) Enter the Ticker Symbol | TRANSACTION (Purchase, Sale or Acquired) | QUANTITY (# of shares) | TRADE DATE | PRICE PER SHARE/SECURITY |
|---|---|---|---|---|
| BIOPURE (COMMON STOCK) | PURCHASE | 6000 | 9/26/03 | 7.10 |
| " | SALE | 1000 | 11/24/03 | 7.13 |
| " | PURCHASE | 3000 | 11/31/03 | 3.50 |

Please list additional transactions on a separate sheet if necessary.

5. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below:

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __22__ day of __January__, 2004.

Model Partners Limited
Stanley Marks
SIGNATURE